May it please the Court, I represent Sigmapharm and given the short time, I will focus my comments on the 945 patent issues and submit the 208 patent issues on the brief, unless the Court has any specific questions, of course. With respect to the 945 patent for Sigmapharm, this case presents the simple question of what is a particle? A particle is an individual discrete portion of something and contrary to what the District Court found, a crystal embedded in a particle is not itself an individual particle. At best, that is what the evidence in this case showed, that within some mixture of PVP and epixaban, there are some crystals of epixaban that are a few nanometers in dimension. So your argument boils down to, as I see it, is that because the product contains epixaban as well as other excipients, it therefore can't infringe? Well, no, I'm saying the particles in our product are composed of PVP, epixaban, and some of that epixaban is actually crystalline and amorphous. So the point that we're making is that the evidence is undisputed that the particles in our product are composed of a mixture of crystalline and amorphous epixaban and PVP and their expert admitted that particles with that composition are not crystalline epixaban particles. Well, I read that expert testimony and I don't really think that's what the expert said. I mean, he didn't say that they're no longer crystalline. No, he said that a particle that is composed of epixaban and other stuff would not be an crystalline epixaban particle because there would be other stuff in the particle. And so our view is that the idea that you can count the crystals that are embedded in a PVP epixaban particle as being themselves individual particles is contrary to the plain language, the plain and ordinary meaning of the word particle, the plain language itself, the written description, the file history, and this court's precedence. This finding is a clear error of fact and law. What do we do about the fact that the district court completely disagreed with your interpretation of that expert testimony, which I think I do too, having read it. That is a factual and credibility determination. How do we get around that? Well, I don't think that what a particle is, for purposes of this case, is a legal question about what the claim term means. What is the plain and ordinary meaning of the word particle in the context of this patent? So a crystal within a particle itself is not a particle. It's like saying that a slab of granite contains a statue before the sculptor sculpts it from the slab. And if you look at the claim language, saying that all crystals are particles renders the term particle superfluous. The patent did not claim a pixivan crystals with a D90 of less than 80 microns. It claimed crystalline pixivan particles with the claimed particle size. Now the written description is also consistent. It says at column three, line 20, that particles refers to individual drug substance particles, whether the particles exist singly or are agglomerated. Now a crystal in a particle is not an agglomerate of the crystal and the PPP. It makes absolutely no sense. And this argument is also consistent with the file history. We talk about Nows, the Nows case. Nows was a solid amorphous dispersion composed of a pixivan. You want to save it until your rebuttal time, counsel? You're now into your rebuttal time. I will, unless the court has any questions, I will reserve my reinders for rebuttal. Thank you, Your Honor. May it please the court. Ms. Guerlain and I are here on behalf of the appellants Sunshine Lake and HEC Farm. And because of the constraints on time, I only want to address a few salient points, and primarily with respect to the claim construction issue. It is our position that Judge Stark, in his decision, in his claim construction decision, was wrong as a matter of law with respect to his interpretation. That interpretation was plain for the phrase crystal in the pixivan particles having a D90 equal to. Because I know you have very little time, let me just move it forward. So you are assuming that the claims must cover a form of measurement, right? Measurement or calculation, that's what the D90 is. So any time a claim has any kind of range, that it necessarily subsumes a method for measuring that range. Well, and I agree contrary to what Judge Stark said, we do not believe that the claim should include a method of measurement. That's not our position with respect to the claim construction. What our position is with respect to claim construction. Wait, I thought you just told me it was. No, I did not. Let me correct myself if that's the impression you gave. The claim construction here and the issue of laser light scattering was not what the appellants were arguing. What we were arguing is that the claim crystalline pixivan particles meant bulk API crystalline pixivan pre-formulated and not formulated to pixivan. And we based that argument on what was set forth in the prosecution history. And that is to get the claims allowed, okay, the patent examiner in the interview summary put it best by saying, and that's at appendix 251. I'm really confused here because your whole bulk argument depends on there being a required form of measurement, right? Not by the claim. No, Your Honor, it doesn't. That's not what we're saying. We're saying that, yes, you have to measure the bulk. The bulk has to have a D90 of less than or equal to 89. But it's the bulk that's being measured, not the formulated pixivan. And that's what's very important. To obtain this patent, the patent, the applicants had to argue figures three and four in the patent. And what do figures three and four show? They show the relationship between the tablet with the specific pre-measured bulk of pixivan as compared to the dissolution characteristics. And the examiner recognized that and found that to be the criticality, the unexpected result. Therefore, the scope of the claim that we're arguing here requires that the crystalline pixivan particles be pre-formulated, having that specific measurement requirement to set forth in the claim. You seem to be confusing premises with conclusions. I mean, your premise, which I still think is the wrong one, is that the measurement is a limitation. The patent use then, say, only discloses one method of measurement, and so, therefore, it has to be measuring the bulk, right? By the method, yes. By the method it discloses in the specification, yes. Right, but getting to the bulk is the conclusion. You have to start with the premise, right? If you don't have a premise of requiring a particular methodology for testing, then you never get to the bulk conclusion, right? But there was well-known methods and methodology for testing bulk crystalline forms at that time. In the patent, the patentee disclosed, I think, seven times laser light scattering. In fact, in discussing the examples in the patent. Right, so you're saying the only method of measurement that can be covered is the laser light scattering. No, I'm saying any measurement that can be made to determine D90, to determine the D90 being less than or equal to 89 of a pre-formulated crystalline material. That's what I'm saying, Your Honor. So you're saying that the district court's conclusion that measurement is not part of the claim is clearly erroneous. Or actually, because it's part of the claim construction, it would be wrong as a matter of law. Correct, Your Honor. That's what we're arguing. That is correct. I'm like Judge O'Malley. I'm a bit confused. I don't see anything in the D90 claim term that limits it to pre-formulated particle sizes. So I'm confused. I thought I understood your brief and the Unichem brief, and I know you don't represent them, and I'll hear from them in a minute, as both suggesting that the only disclosure was laser light scattering, and that can only be performed on bulk epixavan, and that that's why we know that the D90 term has to be limited to a pre-formulated particle size. That's what I thought. That is our argument, Your Honor. Yes. All right. You're over your time. Sit down. Let's hear from the last person then. I'm sorry. I don't know how to say your last name. Is it Pejek? I guess. Pejek? Okay. Please, Mr. Pejek, come forward. I'm assuming, Mr. Pe... Go ahead and start. I'm assuming, Mr. Pejek, you're just going to pick right up where he left off, because you all have basically the same argument, which I understand to be the reason the D90 claim term should be limited to pre-formulated particles is because the method of measure throughout is laser light scattering, and that's only possible on bulk epixavan. So even though the claim itself may not have anything in the D90 limitation that suggests it's limited to bulk epixavan, you think it nonetheless is for that reason. Am I understanding your argument? Yes, Your Honor, but it's slightly different. Okay. We don't require laser light scattering to be part of the claim. It's the D90 that requires it to be the bulk epixavan because one skilled in the art would not know how to measure the D90 of any tableted API. The record is very clear at trial that no POSA, much less an expert at trial, has ever determined the D90 of a tableted API. And in fact, at the time the 945 patent was filed, as well as today, the industry standard was to measure bulk APIs and then manufacture the tablets. That's exactly what the inventors did in this case. So you want us to rely on Dr. Gens' testing? Pardon me, Your Honor? You want us to rely on Dr. Gens' testing? I rely on Dr. Genk and Dr. Meyerson. But what do we do with the fact that the district court said he didn't find Dr. Gens' testing to be reliable because it started with the beginning epixavan material and not with what ended up in the final product? We specifically found that that was not credible or reliable methodology. Correct, Your Honor. But I'm also relying on Dr. Meyerson's appellees expert who also conceded that no POSA had ever determined the D90 of a tableted API. So I'm not relying solely on the doctor. What about the fact that the court relied on Dr. Atwood's testimony? I'm sorry, Your Honor. The court relied on Dr. Atwood's testimony, did it not? To find that you could determine the D90 of a tableted? That you have to determine it based on the end product. On the same process? On the end product. No, the claim itself says, and what the court found enabled here, was its tablets made from epixavan having a specified known D90. That is what all the unexpected results are based upon in figures three and four in the prosecution history. There is no disclosure whatsoever in the 495 patent of how to determine the D90 in the finished tablet. And again, the evidence showed that no one has ever done so. The industry standard, like what the inventors did here, was simply to make tablets with a pre-known and pre-determined D90. That's what the inventors did, that's what the industry standard was, and that's what a poster reading, the specification, would understand. Because there's simply no disclosure of how to measure the D90 of anything in the tablet. So this boils down to you disagreeing with Dr. Atwood's methodology for saying that the end tablet had to have certain levels, right? I don't disagree with Dr. Atwood, I'm just saying the claims cannot cover that because no one would know how to measure it. But he said that your manufacturing process would necessarily result in you having that amount, right? Oh, now I understand, I'm sorry. You're asking more along the questions of how to prove infringement. That's not what I'm talking here. Right, but he said there was a way to do this analysis and know exactly what the measurement would be, right? I do not believe that's the case. In fact, I opposed him, and he said there was no way to understand that and to measure the D90 in the tablet. There's no place in the record that shows any poster, much less an expert, that actually determined the D90. Clearly, he didn't do the physical testing, but the district court credited his circumstantial evidence with respect to what your manufacturing process would necessarily result in, correct? Again, I'm not talking about the Unicam manufacturing process, Your Honor, I'm talking about the disclosure and the patent and what is described as the invention, what is enabled as the invention. And that is a tablet made with a PIXABAN having a known D90. If you look at Figures 3 and 4, I'm almost out of my time, could I finish? Yeah. And so Figures 3 and 4, all the unexpected results all talk about tablets made from a PIXABAN having a certain D90. There's no place in the patent that mentions or talks about determining the D90 in a finished tablet, and there's no prior art that shows that it's ever been done. You're talking about measuring, but aren't there, unless I'm mistaken and I'm looking at the appendix, for example, at page 23, A23, aren't there processes of formulation that produce crystals that necessarily limit their size so that if that process was used, we would know that it complies with the D90? I mean, I guess I understood the district court to find kind of exactly like Judge O'Malley was explaining that there are formulation processes that absolutely result in products that would infringe this claim and be known to infringe this claim because they limit the size the crystal can be. Is that not a correct understanding? But it's always, you have to start. In fact, the court's finding of enablement relies solely upon a tablet it's made with bulk of PIXABAN having a D90 of less than or equal to 89 microns. There's nothing in the record, any place, that if you start with an API having a larger D90 than 89 microns, like Unichem's, that it would ever infringe. There's, the only thing that is described and the only invention that is enabled is one, is a tablet made from a PIXABAN having a specified D90. Okay, Mr. Pejic, thank you very much. Let's hear from Mr. Lee. Thank you, Your Honor. Give them just a second to get situated. May I proceed, Your Honor? Yes, please proceed. May it please the court, my name is Bill Lee and together with my partner, Andrew Danforth, I represent the appellees Briscoe Meyers-Squibb and Fizer. I'm not going to address the 208 patent today since none of the appellants have addressed the 208 patent and as I heard the argument, there were only two issues that were discussed with the court and I'll address those two. I'd like to begin with Sigma Farm's argument about CRISPR and a PIXABAN particles. And to set the record straight, there was no request that this term be construed below. There was never a request to Chief Judge Stark that there be a claim construction of the term. There was never a suggestion that it had anything other than plain and ordinary meaning and that's what Judge Stark applied and then found as a matter of fact that CRISPR and a PIXABAN particles existed in the accused products. That was based on the testimony of Dr. Atwood, Dr. Munson, two different types of testing, all of which showed the existence of CRISPR and a PIXABAN particles. Now, the argument today waxed between sort of a claim construction and sort of challenging the factual findings. The factual findings are very specific, very detailed based upon the experts and based upon the court's assessment of those experts. To the extent this is a claim construction argument offered to the court, it is too late, but it also doesn't make any sense. To go to the composite discussion that Judge Romali had with the appellants, we're not claiming that composite particles demonstrate infringement. In fact, what we contend is that Dr. Atwood and Dr. Munson's testing, the XRPD and SSNMR testing, showed the existence of CRISPR and a PIXABAN particles, and that's what they said. The testimony that was cited to Your Honor was Dr. Atwood being given a hypothetical about a composite particle, and his saying, well, if I would accept what you say, that wouldn't be the particle. But then if you read on immediately, he says, but if you look at the CRISPR and the PIXABAN particle, that's what I found. The only other two points made to you on this were, one, about NAUS, and the chronology here is very important. There were original claims that did not have the dissolution rate limitation. They were rejected over NAUS. There was an amendment to add the dissolution rate limitation, which was core of the invention. Then the examiner allowed it, not because NAUS had amorphous PIXABAN, not because it had some mixture of amorphous PIXABAN and CRISPR and PIXABAN, but because NAUS was a controlled release formulation, and this was an immediate release formulation, and the examiner so said. So let me turn you to something else. So the laser light testing... Yes, Your Honor. ...you admit it can only be done on bulk, right? The laser light testing can only be done on bulk, and actually, Your Honor, the contention to Chief Judge Stark was the claims actually require laser light testing on bulk. But you agree that the only thing disclosed in the written description in terms of discussing testing is laser light testing. That is the method that was used as a historical matter of fact to make the claim of invention. Okay, so why isn't that meaningful?  One is we have to look at the claims, and the claims refer, and if I take you to the specific claim language, the claims themselves refer to a solid pharmaceutical composition. They're talking about the D90, and incidentally, the D90 is not something that you have to measure. It's a threshold that you have to stay below. It's not something that you have to identify specifically. So the claims themselves talk about a solid pharmaceutical composition. They're not talking about the bulk, and the D90 threshold that's described in the claims is in that solid pharmaceutical composition. If there are any doubts about that, if I took the court to Column 5, Lines 18 to 21 of the specification, it's at H262. Sorry, go ahead. This is the place where they explain the particle size, and what the court will see is it is saying what is consistent with the claims, which is it's particle size at the site of dissolution. That's not the bulk of Pexaban. That's the formula to the Pexaban that is administered to a patient, and in fact, it says produce primary particles at the site of dissolution. So the claim term, Your Honor, to answer your question is talking about the pharmaceutical composition. The D90 and the particles that are being referred to are described as at the point of dissolution. To be sure, the laser light scattering is identified. It is a method used to measure bulk of Pexaban. The specification is describing as a historical matter of fact that bulk of Pexaban can be formulated, measured, and then dry granulated so that the... Sorry to interrupt, but do I understand it right that the district court judge held that this D90 measure of 89 or less, less than or 89 is my bet, could be performed or could... Can it be on either pre-formulated or post-formulated? I mean, it could be... They're going to infringe if they've got 89 or less. When it's in bulk, and they're also going to infringe when they've got 89 or less when it's in the formulated. Is that right? Your Honor, no. The second half is exactly correct. If the D90 for the formulated Pexaban, the pharmaceutical composition, is below the threshold, you infringe. But it's not in bulk. On the bulk, there would be a second part to the district court's analysis, which is if the D90 is measured in bulk, then you have to use a process that will ensure that the D90 is not going to change and get bigger during the course of the process. And he found it better... That helps, because if I view this claim the way that you were explaining earlier, which is it's applying to the solid pharmaceutical composition, i.e. the thing that the patient is going to be given for the most part, the end product, then you're right. If this claim covered measuring D90 in bulk and then if a process was used where it would push it larger, that would cause me a concern for claim construction infringement analysis, all of that. And Your Honor would be correct. And what the district court said are two things that are related. One is that in the specification, the process that's identified is a process that measured it in bulk but then used a dry granulation process that would not increase the size, and therefore you would have the required D90. The district court also said that there were other methods that you could use to measure the particle size in the final tablets. I want to clarify one thing. There are other methods you can use to measure the particle size in the final tablets? Yes. Or are there... Yeah, okay, explain that to me. This is a very fine point that I wanted to make about the argument that you just heard. There's the argument that's been made that no one has measured the D90 in the tablet. We don't disagree with that. But there were methods specifically identified by the district court that were known to one of the organized skeletons that would have allowed you to measure the particle size if you wanted to do that. Like electron microscopy or something like that? Yes, and he identified, like, six different methods. Okay. And once you have those measurements, you can determine the D90. The D90 is just a threshold that you need to stay before and you want the distribution to be below that. And what's happened here is the appellants have tried, in order to overturn the district court's judgment, they have tried to take that requirement and make it a requirement of measuring an absolute amount in bulk, right, which doesn't make sense if you read the claim or the specification and ultimately is inconsistent with what the invention was. The invention here was a dissolution rate limitation that improved bioavailability that allowed there to be better bioavailability to... So it's just staying below a threshold. It's staying below a threshold. And the last thing I'll say on this point is this. If you look at Sunshine Lake's reply brief, the argument that was made below was you have to use laser light scattering on bulk. The district court rejected that at Markman and said, no, there's no specific requirement of the manner in which you measure, which is correct. At trial, as Judge O'Malley pointed out, Dr. Genk testified and testified that there was no infringement, but he said he got to that conclusion by rejecting the district court's claim construction and continuing to apply the one that he had offered before that required laser light scattering. So the fact that district court didn't find him credible is not surprising. In the reply brief at three and four, the target has moved again. And now the target is, it doesn't have to be laser light scattering, it just has to be in bulk. That has the same problems. And it's not in the claims, it's not consistent with the claims, and it doesn't save them from infringement. What do you do with Unicom's product by process argument? It's not a product by process claim, Your Honor. There are limited circumstances when you can incorporate a process into a claim. If you had a traditional product by process claim written as such, which this one is not, you might. If there was a specific lexicography, you might. If there was specific prior art that you distinguish, which is why I addressed it now, you might. None of those apply here. And the general proposition that for this type of claim you don't read into process should apply. Unless there are further questions, I will cede my remaining time. Okay, thank you, Mr. Lee. Mr. Mazur, you have some rebuttal time. Your Honor, I'd like to focus on a couple things that counsel said during his presentation. He said that Dr. Munson and Dr. Atwood did some tests, NMR and XRPD tests, to determine that there were crystals. And he said that they found crystalline particles. No, their testing was not to determine or find crystalline particles. It was to find crystals. And you can't have the sleight of hand, and that makes our point, that there's two terms in the claim, crystalline and crystalline particles. And you can't make the particle word superfluous. And that's where you have to take a look at it now. But this sounds like a claim construction argument you didn't make. No, we, actually, I would say it's the other problem. It's he made a claim construction argument that he didn't make. We argued for plain and ordinary meaning of what a particle was. And we stand by that. That's plain and ordinary meaning of what a particle is. And this is not unlike the Aptalis versus Apotex case, where, again, plain and ordinary meaning, and this court reversed the district court's findings that a matrix formulation was a coding over a particle and said, no, they can't reconcile that plain and ordinary meaning argument with the language, with the file history, with the written description, with this court's background. You just cannot skip over this particle limitation. The claim limitation is not crystals with a D90 of less than 89 microns. It is crystalline epixaban particles with a D90 of less than 89 microns. OK, Counselor, you're way over. So thank you. We've got to move it along. Mr. Kuchanski? Thank you, Your Honor. Your Honor, there's a little confusion at the end. And what we're trying to say is the following. The scope of the claim and how it should be interpreted should be commensurate with the scope of the patent or invention that the examiner found. And I put forth to you on, I think it's on page of the appendix 264, the very, very last paragraph of the patent, where it's explained. Figures 3 and 4 illustrate the dissolution data that shows why particle size impacts dissolution. Controlling the particle size to less than 89 microns will result in the dissolution rate that will ensure consistent in vivo exposure. If you look at figures 3 and 4, there's nothing in those figures that show a measurement of particle size of formulated epixaban. What is shown and what was proven is patentable is that figures 3 and 4 show the measurement of pre-formulated epixaban. It's very clear there. And as it goes on, just to finish off. OK, counsel, I've got to keep it fair. I didn't realize you had used all your rebuttal time. And I've now given you more than a minute and a half all the additions. I've got to move it on. Thank you, Your Honor. Thank you, Your Honor. And obviously, I'll make it very brief. I would first like to address the point that Mr. Lee made, where he said the 945 patent contemplated measuring the dissolution at the site of absorption. Well, that's just part of the quote that's actually in the patent. If you continue on, it says the feature of this invention, however, involves the processes that produce epixaban dosage forms with the ability to produce primary particles at the site of dissolution with a D90 of less than 89 microns. That's exactly what we're saying. This is a tablet. The invention here is a tablet made with epixaban having a pre-known D90. And here, BMS was acting as their own lexicographer with defining the D90, which they did in the specification. D90 must have a meaning as a claim limitation. And if the claims are construed to cover both pre-formulated and formulated epixaban, then there is no meaning to the term D90. Further, written description and enablement must be for the full scope of the claims. That is, measuring the D90 of both the bulk and the finished. Here, the 945 patent omits completely the concept of determining the D90 in a tablet. So that is just not described, nor is it enabled. So to the extent that BMS or appellees would like to have claims that cover both the bulk and the formulated epixaban, those claims violate Section 112, and they simply cannot have their cake and eat it too. Okay, thank you, counsel. I thank all counsel in this case. The case is taken under submission.